FILED

2012 May-09  PM 02:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

CORETHA PHILLIPS,

      PLAINTIFF,

v.                                        CASE NO.: CV-11-J-1471-NE

JOHN MCHUGH,
SECRETARY OF THE ARMY,

      DEFENDANT.

## MEMORANDUM OPINION

Pending before the court is the defendant's motion to dismiss and for summary judgment (doc. 17), evidence in support of said motion (doc. 18), and memorandum in support of its motion (doc. 19), to which the plaintiff filed a response and evidence in opposition (doc. 25) and the defendant thereafter filed a reply (doc. 28). Having considered the pleadings and evidence, the court finds as follows:

## I.  Factual Background

Plaintiff sues her current employer for violations of Title VII, 42 U.S.C. §§ 2000e *et seq.*, for race based hostile environment (Count 1); disparate treatment (Count 2); and discriminatory reprisal (Count 3).[1]  Amended Complaint (doc. 6). The parties do not dispute that the plaintiff was employed by the defendant during the

---

[1] The plaintiff voluntarily dismissed Count 1 of her amended complaint, namely race based hostile environment.  Plaintiff's response (doc. 25) at 9.

relevant time period as a GS-14 Supervisory Contracts Specialist and a Division Chief, Acquisition Management Division, Business Management Directorate of the Cruise Missile Defense System, until May 17, 2010, when she was reassigned to a non-supervisory position at the same grade and pay level she previously held.[2] The defendant is the Department of the Army.[3] The plaintiff's complaints with defendant involve numerous discrete actions, set forth in multiple EEO Charges, detailed below. According to the plaintiff she suffered disparate treatment based on her race and suffered retaliation when she complained about the same.

## A.  November 2008 EEO Charge

The facts relevant to this charge began in February of 2008, when the plaintiff was accused by her direct supervisor, Steve Gierhart, of being rude to the janitorial staff.  Defendant ex. 16 at 93-96; Gierhart depo. (exhibit 67) at 83.  Gierhart called plaintiff into his office on February 14, 2008, to discuss both this and plaintiff repeatedly failing to follow the chain of command.  The plaintiff learned this was an

---

[2]The plaintiff became a supervisor/division chief in 2004. Defendant ex. 5.  She is the only black in this position under Gierhart and believes he treated her differently.  Defendant ex.16 at 14, 31-32, 155.

[3]Numerous employees of defendant were in plaintiff's supervisory chain from February 2008 until May 2010.  The essential personnel for this court's purposes are as follows: Plaintiff's direct supervisor was Steve Gierhart.  Over Gierhart, who was replaced by Julia Vaughn in 2009, was Mike Bieri, who was replaced by Felicia Cook in Feb. 2009.  Defendant ex. 52 at 177, 316; defendant ex 63 at 229-230.  Bieri in turn reported to Colonel Mullins, who was replaced by Colonel O'Donnell in 2008.  Defendant ex. 52 Vol II at 49.  The Colonel position reported to General Dellarocco.

official counseling session after the fact, when she received an email from Gierhart stating this.  Defendant exhibits 8, 9, defendant ex. 16 at 96-97, 157-158; plaintiff depo. (exhibit 65) at 34-37.   At the February 4 meeting, the plaintiff informed Gierhart she had requested a meeting with General Dellarocco, who was above both plaintiff and Gierhart on the chain of command, to ask to be removed from Gierhart's supervision because they clashed.  Plaintiff depo. at 35-36.  She also told Gierhart he should have asked her about the janitorial complaints first because she had complained about her trash not being emptied that week.  *Id*. at 34-35. The plaintiff alleged that the janitorial staff complained about someone else the same month the complaints were registered against her, and all the other person had to do was apologize.  *Id*. at 48.

Gierhart testified that part of the counseling was because of plaintiff's habit of routinely going over his head.  Gierhart depo. at 62.  The February 2008 counseling session also chastised plaintiff for going to Colonel Mullin to request training Gierhart had already told her she could not attend.  Bieri depo. (exhibit 66) at 73.

The day following this counseling session, the plaintiff contacted the janitorial contractor and accused its employees of lying about her.  Defendant ex. 10, defendant ex. 16 at 64, 67, 158-161.  The plaintiff states she called them because, given the dissension between her and Gierhart, she simply did not believe he got complaints

from the janitorial staff.  Plaintiff depo. at 39.  When Gierhart learned of plaintiff's actions in contacting the janitorial staff, he decided to formally reprimand her. However, the resulting suspension was not processed until August 2008, because Colonel Mullin wanted the plaintiff's complaints against Gierhart investigated first. Defendant exhibits 6, 7 and 16 at 69, 97-102, 108-109, 171.  Plaintiff's claims against Gierhart were investigated and  found to be meritless, allowing the formal reprimand against plaintiff to proceed.  Defendant ex. 16 at 171-173.  The plaintiff asserts the reprimand was in reprisal for asking General Dellarocco to remove her from Gierhart's supervision.  Plaintiff depo. at 48.

Mike Bieri, Gierhart's direct supervisor did not interview anyone before agreeing with the February counseling session and subsequent reprimand because, based on Gierhart's statement, he agreed that the counseling and suspension were warranted.  Bieri depo. at 58-59.  Bieri believed Gierhart was trying to help the plaintiff.  *Id.* at 61.

According to Gierhart, the plaintiff was always complaining about her performance rating and going over his head.  Gierhart depo. at 47.  The plaintiff asserted in response that she should be able to talk to supervisors without fear of reprisal.  Defendant ex. 11; see also defendant ex. 16 at 46, 47, 70-71.

4

Gierhart agrees there was an open door policy, and employees could go to someone other than their immediate supervisor, but said the plaintiff had to follow the chain of command and that the open door policy meant his door was open. Defendant ex 16 at 162-164, 181, 201-202. In deposition, Gierhart stated there was no written open door policy. Gierhart depo. at 60. According to Colonel O'Donnell, there was no written policy stating an employee had to go to the direct supervisor with a problem before going higher. Ex. 52 Vol II at 42-43. According to Bieri, the open door policy meant that everyone had to go up the chain of command and exhaust all those avenues, but sometimes they could skip their direct supervisor. Bieri depo. at 10-11. When presented the written policy itself, Bieri said it suggested people work up the chain of command to resolve issues, but agreed it was not required. Bieri depo. at 68; defendant ex. 68. Bieri said, even with knowledge of the problems between plaintiff and Gierhart, she should not have gone to General Dellarocco with complaints because she could have gone to his deputy manager. Bieri depo. at 72.

**B.  February 9, 2009, EEO Charge**:

The plaintiff filed another EEO charge in February 2009, over her lack of service award and her performance rating. Defendant ex. 17. She complained because  Gierhart rated her as a 3 out of 5 on her performance review in December 2008, which was her lowest rating ever. Defendant ex. 16 at 33, 55, defendant ex. 17.

5

At the same time plaintiff was named for a $2,000.00 award for hard work by Colonel

Gary Laase,[4] Project Manager, which was overruled by Gierhart. Defendant ex. 20-

22. Gierhart denied this award for plaintiff while approving an award for another

black supervisor, Barbara Blackburn, and reducing other awards for her. Defendant

ex. 16 at 35-36, 58, 125-127, 131-134, 237; Gierhart depo. at 54-55. The plaintiff

testified Gierhart told her he was denying the award because of her EEO activity and

because she did not support a recommendation he made on a contract issue. Plaintiff

depo. at 78. Gierhart stated he denied the award because Colonel Laase did not

follow the proper procedure. Defendant ex. 67 at 54-59. At the hearing on this claim,

Laase testified the plaintiff was an excellent supervisor and deserved the award for

which he recommended her. Defendant ex. 16 at 234-238. However, he added that

he had not seen Gierhart act in a discriminatory or hostile manner toward plaintiff.

*Id*. at 232-233. Mr. Gierhart was not the final authority on deciding the award issue.

The final supervisory authority was Colonel O'Donnell.[5] *Id*. at 238-239.

---

[4]He is incorrectly referred to in this hearing transcript as Gary Loxie. His last name is Laase. *See* plaintiff depo. at 75.

[5]Although Laase did not know the ultimate decision made by Colonel O'Donnell, the Colonel must have ultimately agreed with Gierhart in denying the award as plaintiff alleges she did not get it.

Plaintiff also asserts Gierhart undermined her supervisory authority and ignored her in favor of the white supervisors. Defendant ex. 16 at 43-45, 266-267; defendant ex. 68.[6]

## C.   June 2009, July 2009 and August 2009 EEO claims

The plaintiff again claimed reprisal for prior EEO activity for a proposed suspension in August 2009 by Felicia Cook.[7]  Defendant ex. 23, 24, and 25 at 28-29, 34; defendant ex. 29; plaintiff depo. at 87.  The plaintiff's supervisory chain of command at the time was Julia Vaughn, who had replaced Gierhart; Felicia Cook, who had replaced Bieri; and Colonel O'Donnell.  Defendant ex. 25 at 16-17, 19.  The plaintiff was removed as division chief in June 2009 and had been tasked to whatever Julia Vaughn delegated.  *Id*., at 22.

Bieri, although no longer a direct line supervisor, was the deciding official on the August 2009 proposed suspension.  Bieri depo. at 111-112. Bieri does not believe any of the discipline was discriminatory, and was impartial in approving a suspension for plaintiff.  *Id*., at 125.

---

[6]These exhibits include a statement from Stephen Bradford that states plaintiff was singled out and ignored as a supervisor.  He testified that although the plaintiff was his supervisor, he was told to take instruction from someone else.  Defendant ex. 16 at 264-267, 278.  However, he also stated that he never heard Gierhart make any derogatory comments about the plaintiff's race.  *Id*., at 263.

[7]Felicia Cook did not know or work with the plaintiff prior to February 15, 2009.  Plaintiff depo. (exhibit 63) at 230-32.

The proposed suspension arose from several discrete incidents:

1. On May 1, 2009, General Dellarocco announced Geirhart was leaving their area.  Defendant ex. 52 at 66.  Shortly thereafter, the plaintiff was cited for not following supervisory instructions.  Defendant ex. 25 at 39.  She left at 4:30 on May 7, 2009, with planned time off, and did not see an email attachment sent that date at 5:44 p.m., until she returned to work on May 15, which instructed her to contact Gierhart to discuss her interim assessment.  *Id.,* at 39-40, 44.  When she saw it on May 15, she requested the May 18 meeting with Felicia Cook rather than calling him as instructed.  *Id.*, at 40.  Gierhart was on leave at that point, having been off work since May 13.  Defendant ex. 52 at 209-210.  However, Cook faults plaintiff for not calling Gierhart to discuss her interim report prior to May 15. *Id*., at 207-210, 212-213.  The plaintiff told Cook she was concerned about Gierhart evaluating her when she had ongoing EEO claims against him.  *Id.* at 192-196.

2. The plaintiff was given an assignment by Geirhart in December 2008 that was not implemented by May 4, 2009, for a variety of reasons.  Plaintiff reported that Gierhart yelled at her on May 4, 2009, in a meeting with him and Colonel O'Donnell, because the assignment had not been completed.  Defendant ex. 52 at 50-57, 62-69.  According to Gierhart and Cook, the May 4 meeting was for Colonel O'Donnell to clarify to the plaintiff what his expectations were based on a request by

the plaintiff for the same.  *Id.*, at 101, 178.  According to O'Donnell, he called the meeting because two contract requirement packages had come to his office in poor shape, with grammatical errors. He assumed it was plaintiff's fault because she was the lead of the acquisitions management branch.  Defendant ex. 52 Vol II at 30.  Cook stated no one raised their voices in this meeting, that O'Donnell did not care about the format used, and that he told plaintiff what information he needed included in the charts.  Defendant ex. 52 at 185-189.  According to plaintiff, the May 4 meeting was aimed at her specifically for not using the report format designated by Gierhart in December 2008.  Defendant ex. 52, Vol II at 24.

      3.   On May 18, 2009, the plaintiff asked an NAACP representative to come to the meeting she had arranged with Cook to discuss her interim report. Defendant ex. 25 at 37.  Other employees stated she and Cook were very loud with each other.  *See e.g.* plaintiff depo. at 100-101; defendant ex 31-33.  The plaintiff believed the escalating issues were based on race and reprisal  because prior to her EEO complaints, Gierhart had no issues with her work. Defendant ex. 52 Vol II at 27. However, Gierhart states the plaintiff's skills deteriorated.  Gierhart depo. at 75.

      4.   On May 29, 2009, there was another meeting suggested by Cook to listen to plaintiff's problems with Gierhart's assessment of plaintiff and Gierhart's response.  Defendant ex. 52 at 204.  The plaintiff states Gierhart was hostile to her.

*Id.*, at 129.  He told plaintiff she could not communicate or write.  *Id.*  Gierhart says this meant she did not communicate with him, instead going over his head on a number of occasions.  *Id.,* at 147.  He accused her of using the open door policy instead of coming to him, when she wanted to complain about things he had done.  *Id.*, at 163.  According to Cook, Gierhart "remained calm in a tense situation" although the plaintiff threatened that she would go to the EEO if Gierhart did not make the changes plaintiff wanted to her interim performance appraisal.  *Id.*, at 215.  According to Donald Hunter, the recorder at this meeting, no one raised their voices and both plaintiff and Gierhart were professional.  *Id.*, at 285, 295.

   5. Several "To Whom It May Concern" letters were written by individuals under the plaintiff's supervision complaining about the plaintiff's unprofessional conduct, at the beginning of June 2009.  Defendant ex. 36-39.  They address events concerning the plaintiff as far back as 2002.  The plaintiff states she had just reprimanded both of these employees, Barbara Blackburn and Gwen Phillips.  Plaintiff depo. at 71.  However, in addition to the accusations made by Blackburn and Phillips, other employees, namely Kimberly Hendrix (black female), and Margaret Moulder (white female), had made complaints about plaintiff's conduct.  Defendant exs. 38 and 39.

6.  On June 4 or 5, after review of her mid-term assessment, Colonel O'Donnell found the assessment accurate, told her that her work was not up to par, and told her to improve her performance. Defendant ex. 28 at 43.

7.  Also in June 2009 General Dellarocco told the plaintiff that because of her hostile environment allegations, he would have her relocated with the same job duties until an investigation was completed.  Defendant ex. 28 at 50.  On June 23, 2009, General Dellarocco issued a memo to begin an informal investigation into plaintiff's subordinates' complaints by an independent investigator outside of the command.  Defendant exs. 40-41.  Cook stated the plaintiff was removed from supervisory duties so her complaining subordinates could make those complaints without fear of retaliation.[8]  Defendant ex. 52 at 225-226.

8.  On June 24, 2009, the plaintiff was told Colonel O'Donnell requested a meeting with her, but the plaintiff already had another appointment at that time to attend.   Defendant ex. 25 at 48.   According to the plaintiff, she learned of O'Donnell's request late in the day but according to O'Donnell, she was informed of it at 9 a.m. for a 5 p.m. meeting, yet did not respond until 4:30 p.m. that she could not be there. *See* defendant ex. 52 Vol. II at 67.  The plaintiff stated that she was trying

---

[8]Cook agrees that when Dellarocco was investigating plaintiff's complaints of hostile environment against Gierhart, Gierhart was not relieved of his duties.  Defendant ex. 52 at 228-229, 233-234.

to have her other obligation, a dental procedure, moved, and learned at 4:30 it could not be moved.  Plaintiff depo. at 107.  The plaintiff then left for the day.  O'Donnell had his secretary reset the meeting for the following day, June 25, at 7 a.m. via a 4:48 p.m. email on the 24th.  Defendant ex. 52 Vol II at 69; plaintiff depo. at 112-113.  The plaintiff wanted an advisor with her for the meeting because she knew about the complaints against her and who was going to be at the meeting.  Plaintiff depo. at 115.

That morning, plaintiff saw Colonel O'Donnell at the elevator and he said she had to go to his office right then.  She said she was going to meet her advocate first.  Defendant ex. 25 at 50; defendant ex 52 Vol II at 71; plaintiff depo. at 116.  O'Donnell found this action to show a lack of respect for the Colonel's position and authority.  Defendant ex. 25 at 50.  Plaintiff asserts she never said no, she said she had a representative waiting in the lobby, and O'Donnell got in her face and told her he wanted her there "right now!"  *Id.*,  at 51.  O'Donnell agreed he was stern, but he did not yell at her.  Defendant ex. 52 Vol. II at 72.  The plaintiff stated he blocked her way so she could not get on the elevator.  *Id.* at 62-63.  The plaintiff reported this incident to a police officer and others, including the IG.  Defendant ex. 25 at 57, 102.  *See also* defendant ex. 25 at 82; exhibit 28 at 70; plaintiff depo. at 118.  The one

person who did see them at the elevator said nothing unusual occurred. Defendant ex. 28 at 61; Defendant ex. 52 Vol. II at 98.

Cook stated that O'Donnell started the June 25 meeting once the plaintiff arrived by saying plaintiff wasted 17 minutes of his time and he had things to do. Defendant ex. 52 at 224; see also defendant ex. 52 Vol II at 73. However, she also states O'Donnell never raised his voice to the plaintiff. Defendant ex. 52 at 229. O'Donnell told plaintiff's advocate that he could not be in the meeting. *Id.,* at 230, defendant ex. 52 Vol. II at 73. Hunter states this meeting was calm, and it was a professional environment. Ex. 52, at 285.

The purpose of this meeting was to inform the plaintiff there would be an investigation of her for releasing confidential information and that she was being relieved of her supervisory duties until the investigation was completed. Defendant ex. 28 at 34, 52; ex. 52 Vol II at 59; plaintiff depo. at 119. O'Donnell stated he had received two allegations of misconduct against her. Defendant ex. 52 Vol II at 75; *see* also plaintiff depo. at 111, 193. She is the only supervisor he ever had investigated. Defendant ex. 52 Vol II at 80-81. She is the only supervisor he has ever relieved of supervisory duties. *Id.,* at 84-85.

The temporary assignment was to complete specific projects. At the time of the October 2009 hearing, the plaintiff was still so assigned, and stated the

assignment had been extended through February 2010.  Defendant ex. 52 at 16. While on temporary assignment, the plaintiff was given the August 2009 proposed suspension for the same things, namely the events of May 7, 18 and June 25, by her supervisor Felicia Cook.  Defendant ex. 29.  The August 2009 proposed suspension included being loud with Cook on May 19, 2009, and failing to follow supervisory instructions, specifically concerning her failure to contact Gierhart in May concerning her interim appraisal.  Plaintiff depo. at 102.

The plaintiff believes the August 2009 proposed suspension[9] was retaliatory. Defendant ex. 25 at 52.  Until she received the proposed discipline, she had no idea the alleged actions even carried the potential for discipline.  *Id*., at 58.  She believes she is treated differently than other supervisors who are white.  *Id*., at 59.  The plaintiff also asserts Cook was openly hostile to her on August 21, 2009.  *Id.*, at 83-86.

Thereafter, General Dellarocco stated that he had reviewed plaintiff's grievance concerning the proposed ten day suspension, noted that she was reprimanded in September 2008 for failing to follow instructions of her supervisor, and found that

---

[9]Concerning the actual October 2009 suspension itself which resulted from the August 2009 proposal,  the plaintiff followed the grievance procedure rather than the EEO procedure, in an appeal to the MSPB rather than the EEOC.  Plaintiff depo. at 89-92.

she continued to do the same.  Defendant ex 26.  He determined no violations of law or regulations occurred in respect to the matters raised in her grievance.  *Id.*

With regard to the August 2009 investigation itself, the appointed investigator found a good deal of truth to the accusations against the plaintiff, specifically that she yelled at her employees and was not always truthful with them.  Defendant ex. 49. Kimberly Hendricks, a black woman who worked under the plaintiff, testified that the plaintiff made a comment to her one time to stop working so hard because a white man was going to get the job Hendricks wanted.  Defendant ex. 52 at 256-257.  She also thought plaintiff interacted with her subordinates inappropriately by speaking to them unprofessionally or in a demeaning manner, on more than one occasion.  *Id*., 52 at 257-258.  However, she was not supervised by plaintiff.  *Id*., at 258-259.  She did work closely with those under plaintiff and thinks plaintiff harassed her own employees.  *Id*., at 259-261.  She also added that she has no doubt that the plaintiff could do her job very well as far as the technical aspects of it.  *Id*., at 265.

According to Kim Stenberg, another supervisor, Gierhart was hard to work for because he micromanaged, did not communicate, and talked a lot without saying much, but plaintiff was not always helpful on collaborative tasks.  Defendant ex. 52 at 270-273.  Stenberg said her employees complained that Gierhart was hard to get along with and they did not want to go to meetings with him.  *Id*., at 279.  Another

15

witness, Donald Walley, an engineer who attended meetings with plaintiff and Gierhart, stated there was obviously tension between plaintiff and Gierhart, because Gierhard wanted things done one way and plaintiff wanted them done the correct way. *Id.*, at 303-306.  Steven Bradford also stated that despite plaintiff's knowledge and background in contracts, Gierhart would go against her decisions.  *Id*., at 356. In fact, Gierhart "put the government at risk" with some of his decisions.  *Id.*, at 357. Gierhart talked down to everybody but focused on plaintiff.  *Id*., at 357, 359.  Several of the witnesses went to Colonel Mullin to say Gierhart was going around plaintiff and favoring a white female (Eliza Milton).  *Id.*, at 360, 363-364.   Bradford commented that he liked working for plaintiff but could not stand the strange decisions being made by Gierhart, so he took a different job.  *Id.*, at 362-363.  The independent investigator ultimate finding was as follows:

> In view of the above findings, as the Investigating Officer, I recommend that this investigation be forwarded through Ms. C. Phillips' PEO Missiles and Space supervisory chain to determine whether administrative or disciplinary action is appropriate for Ms. Phillips' actions.   In addition to administrative or disciplinary action, I recommend that her chain of command consider reassigning Ms. Coretha Phillips to another organization within PEO Missiles and Space and provide her the opportunity to attend Leadership and Communication Skills training.  Ms. Phillips' inability to communicate and lead employees is consistent with the complaints in the sworn statements by her subordinates, co-workers and supervisors.

Defendant ex. 49 at 3.

### C.  April 6, 2010, and April 28, 2010, EEO claims

Less than a week after the October 2009 grievance hearing, during a further investigation of plaintiff begun October 28, 2009, she was found to have engaged in misconduct based on her treatment of her employees and again removed from her supervisory duties by Julia Vaughn.   Defendant ex. 55; defendant ex. 63 at 56. Vaughn never personally spoke to the employees in question, and never asked plaintiff for her side of the story.  Defendant ex. 63 at 55-56.  This was again related to the June 2009 discipline of the two employees who then complained about the plaintiff.  *Id.,* at 194-195.  The discipline was for falsifying time and delinquent work products.  Plaintiff depo. at 192.  According to Cook, the above investigation was done by an outsider, Barbara Herbert, because of the plaintiff's history.  Defendant ex. 63 at 234.

The plaintiff also takes issue with a performance appraisal done by Vaughn in January 2010.  She believes the low rating for supervisory skills was in retaliation for previous EEO complaints.  Defendant ex. 63 at 33, 136.  That rating prevented her from getting a bonus.  *Id*., at 147. Vaughn stated the rating was because of the insubordination and other actions addressed in the disciplinary action.  *Id*. at 34-42. However, because Vaughn began her job in May 2009 and the plaintiff was removed as a supervisor in June 2009, Vaughn used information and allegations which were

part of an ongoing investigation from pre-June 2009. *Id.*, at 46. She had no personal knowledge of plaintiffs' treatment of employees. *Id*., at 48, 51.

Vaughn admits she did not know much about contracting and relied on plaintiff for that, although she also testified that she reduced plaintiff's rating for not following her instructions on contract issues. Defendant ex. 63 at 65-66, 84-85. Vaughn also reduced plaintiff's rating for not listening to what the engineers were saying, and for not using good communication. No one on plaintiff's team ever said she did not communicate well, and in fact praised her abilities. *Id*., at 87, 91, 107.

In May 2010 plaintiff was reassigned to a non-supervisory GS 14 position permanently, by Felicia Cook. Defendant ex. 56, 57; defendant ex. 63 at 16; plaintiff depo. at 10. This job is directly under the Program Executive Office so she is no longer supervised by Vaughn or Cook. Defendant ex. 63 at 17.

The plaintiff states every time she went over and outside of her management chain, she received a different disciplinary status, so she believes it was all in reprisal. Defendant ex. 63 at 198. Plaintiff solicited emails that show she was doing her job well, and co-workers stated so. *See e.g.*, defendant ex. 64 at 97-118.

Once the plaintiff switched to a new management team in May 2010, she began receiving performance awards again. Plaintiff depo. at 12. However, Bieri agrees that removal from supervisory duties and negative performance ratings could

decrease plaintiff's chances of promotions.  Bieri depo. at 25-27.  Bieri stated that, although closely connected in time, none of the above events were in reprisal.  Bieri depo. at 33, 35.  He agreed there were ongoing problems between plaintiff and Gierhart, but did not think it was discrimination or retaliation. *Id*. at 40.  He believed plaintiff just disliked Gierhart.  *Id*. at 40.

## II. Standard of Review

A moving party is entitled to summary judgment if there is no genuine issue of material fact, leaving final judgment to be decided as a matter of law. *See* Federal Rule of Civil Procedure 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587, 106 S.Ct. 1348, 1355-56 (1986).  An issue is "material" if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case.  It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party.  *Allen v. Tyson Foods, Inc*., 121 F.3d 642, 646 (11th Cir.1997).

The facts, and any reasonable inferences therefrom, are to be viewed in the light most favorable to the non-moving party, with any doubt resolved in the nonmovant's favor. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158, 90 S.Ct. 1598, 1609 (1970). Once met by the moving party, however, the burden shifts to the non-moving party to come forward with evidence to establish each element essential

to that party's case sufficient to sustain a jury verdict. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir.1990).

A party opposing a properly submitted motion for summary judgment may not rest upon mere allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Eberhardt v. Waters*, 901 F.2d 1578, 1580 (11th Cir.1990). In addition, the non-moving party's evidence on rebuttal must be significantly probative and not based on mere assertion or be merely colorable. *See* Rule 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S.Ct. 2505, 2511 (1986). Speculation does not create a genuine issue of fact. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir.2005).

The court must consider the evidence in the light most favorable to the plaintiff and may not make credibility determinations nor weigh the parties' evidence. *Frederick v. Sprint/United Management Co.* 246 F.3d 1305, 1311 (11th Cir.2001); *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir.2000).

### III.  Legal Analysis

***A.  Count II:  Disparate Treatment***:

A plaintiff may prevail on an employment discrimination claim by either proving that intentional discrimination motivated the employer or producing

20

sufficient evidence to allow a rational trier of fact to disbelieve the legitimate reason proffered by the employer, which permits, but does not compel, the trier of fact to find illegal discrimination. *Wilson v. B/E Aerospace, Inc,*. 376 F.3d 1079, 1088 (11th Cir. 2004), citing *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 147-48, 120 S.Ct. 2097, 2108-09, 147 L.Ed.2d 105 (2000).

Plaintiff asserts that the above facts constitute disparate treatment based on her race. A plaintiff may establish a claim of illegal disparate treatment through either direct or circumstantial evidence. *Crawford v. Carroll*, 529 F.3d 961, 975-976 (11th Cir.2008) (internal quotation marks and citation omitted). As there is no direct evidence of discrimination, the court applies the analysis required for circumstantial evidence. This court must apply the three prong test fashioned by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817 (1973). *See also Texas Department of Community Affairs v. Burdine,* 450 U.S. 248; 252-253; 101 S.Ct. 1089, 1093-1094 (1981). First, the plaintiff must establish a *prima facie* case of discrimination. *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. at 1824. Establishment of a *prima facie* case creates a presumption that the employer unlawfully discriminated against the employee. *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-1528 (11th Cir. 1997). Assuming the employee meets this burden, the burden then shifts to the defendant to

21

articulate a legitimate, nondiscriminatory reason for the alleged discriminatory employment action. *Harris v. Shelby County Board of Education,* 99 F.3d 1078, 1083 (11th Cir.1996).

Once a defendant presents a legitimate, nondiscriminatory reason for its action, the presumption of discrimination drops from the case. *Burdine,* 450 U.S. at 255, 101 S.Ct. at 1094 and n. 10. The plaintiff must then demonstrate by a preponderance of the evidence that the reason offered by the defendant was not the true reason for the employment decision, but rather a mere pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825. The focus of the case after the defendant meets its burden of production is on the defendant's subjective intent and the motivation behind the defendant's adverse employment action directed at plaintiff. *Harris*, 99 F.3d at 1083.

The plaintiff meets her prima facie burden of proof by establishing that (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) the employer treated similarly situated employees outside the class more favorably; and (4) she was qualified to do her job. *See Rice-Lamar v. City of Fort Lauderdale,* 232 F.3d 836, 842-43 (11th Cir.2000); *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir.2000). The plaintiff asserts her claim is based on the discrete incidents detailed above.

The plaintiff is member of a protected class and was subjected to adverse employment actions.  She was qualified for her job.  The plaintiff asserts Eliza Milton, a white female supervisor, was treated more favorably.  Gierhart admits plaintiff's award recommended by Laase was the only one he ever denied. Plaintiff also asserts Milton's subordinates complained about her and she was not removed from supervisory duties.  Evidence that similarly situated employees are disciplined more leniently is admissible to support a disparate treatment claim "when the plaintiff has established that the co-employees are in fact similarly situated." *Anderson v. WBMG–42*, 253 F.3d 561, 564 (11th Cir.2001). To be an adequate comparator, the preferentially treated individual from outside plaintiff's protected class must be similarly situated to the plaintiff in all relevant respects. *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997). If this is not the case, "the different application of workplace rules does not constitute illegal discrimination." *Lathem v. Dep't of Children & Youth Servs.*, 172 F.3d 786, 793 (11th Cir.1999).  "The relevant inquiry is not whether the employees hold the same job titles, but whether the employer subjected them to different employment policies." *Id.* When an individual proves that she suffered an adverse employment action while her comparator did not, although they both violated the same work rule, "this raises an inference that the rule was discriminatorily applied." *Id.* (citation omitted). In addition, "that the quantity and

23

quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Maniccia v. Brown,* 171 F.3d 1364, 1368 (11th Cir.1999).

Having carefully reviewed all of the evidence, the court finds that Eliza Milton is not a valid comparator. While Ms. Milton received an award when plaintiff did not, and while they were both division chiefs under Gierhart, there is no suggestion that Milton repeatedly ignored the chain of command, was late for meetings with superiors, or challenged the janitorial staff when they complained to her superior about her. Because the plaintiff has not pointed to any individual "similarly situated in all respects," the plaintiff is unable to prevail on her prima facie case.

Even if the court found Milton to be a valid comparator for purposes of the plaintiff's prima facie case, the defendant offered legitimate reasons for each of the adverse actions taken against the plaintiff.[10] The reason offered by an employer for

---

[10]The court agrees with the defendant that the August 2009 Notice of Proposed Suspension is not an adverse employment action. *See e.g.*, 29 C.F.R. § 1614.107(a)(5). Additionally, the October 2009 suspension is not properly before this court because the plaintiff opted to follow the grievance procedure, rather than the EEO procedure, on that one complaint. 29 C.F.R. § 1614.107(a)(4). *See also, Crawford v. Babbitt* 186 F.3d 1322, 1326 (11th Cir.1999)("A federal employee must pursue and exhaust her administrative remedies as a jurisdictional prerequisite to filing a Title VII action"); citing *Brown v. General Servs. Admin.*, 425 U.S. 820, 832-33, 96 S.Ct. 1961, 1967-68, 48 L.Ed.2d 402 (1976); *Wade v. Secretary of the Army*, 796 F.2d 1369, 1377 (11th Cir.1986).

an action "'does not have to be a reason that the judge or jurors would act on or approve' ... Instead, all that matters is that the employer advance an explanation for its action that is not discriminatory in nature." *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1269 (11th Cir.1999). The defendant here has done so. It has addressed each of the plaintiff's discrete complaints and offered a valid reason for its actions. The court's role is not to judge whether decisions are prudent or fair, but rather only whether they are motivated by a discriminatory animus. See e.g., *Lee v. GTE Florida, Inc.,* 226 F.3d 1249, 1253 (11th Cir.2000).

Because the plaintiff failed to offer an appropriate comparator, and further failed to rebut the defendant's legitimate, non-discriminatory reasons for its actions, the court must grant summary judgment on the plaintiff's claims for discrimination.

### B. Retaliation

The plaintiff also alleges that the escalating disciplines and final removal from her supervisory role were in reprisal for her prior complaints that she was the victim of discrimination. Plaintiff's response (doc. 25), at 15. To establish retaliation for engaging in protected activity, the court must apply the *McDonnell-Douglas* burden shifting standard. The plaintiff must prove (1) she participated in protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment

decision. *Gupta v. Board of Regents*, 212 F.3d 571, 587 (11th Cir. 2000), citing *Farley v. Nationwide Mut. Ins.*, 197 F.3d 1322, 1336 (11th Cir.1999). *See also Holifield v. Reno,* 115 F.3d 1555, 1566 (11th Cir.1997).

Clearly, the plaintiff participated in protected activity and has suffered adverse employment actions.[11] Thus, the court examines whether there is a causal connection between the protected activity and the adverse actions.

Having sought evidence that the events about which the plaintiff complains are not "wholly unrelated" to her protected activity, the court can find none. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir.2001); *Clover v. Total System Services, Inc.,* 176 F.3d 1346, 1354 (11th Cir.1999) (quoting *Simmons v. Camden County Bd. of Educ.,* 757 F.2d 1187, 1189 (11th Cir.1985)). For the same reasons that the court does not find the myriad of discrete actions against the plaintiff to be discriminatory, the court finds the same were not in retaliation for protected activity. The defendant has offered legitimated, non-discriminatory reasons for each of these actions, which the plaintiff has failed to rebut.

---

[11]Although the defendant argues the plaintiff has not suffered any adverse action, the Eleventh Circuit has held that Title VII "does not require proof of direct economic consequences in all cases." *Holland v. Gee*, – F.3d –, 2012 WL 1292342 (11th Cir.2012), citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64–65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986). Thus, a transfer can be adverse "if it involves a reduction in pay, prestige or responsibility." *Id.*, citing *Hinson v. Clinch Cnty., Ga. Bd. of Educ.*, 231 F.3d 821, 829 (11th Cir.2000). As such, the repeated removal of plaintiff's supervisory duties and authority suffices as an adverse employment action.

Specifically, even if Gierhart sought to retaliate against the plaintiff due to her repeated complaints against him, the plaintiff offers no explanation as to why Bieri, Cook, Vaughn, O'Donnell, Dellarocco, and independent investigators would find merit in various accusations against her and authorize the resulting disciplinary actions. The plaintiff offers no evidence, or even argument, how all of these individuals could act with the requisite discriminatory animus against her.

In essence, the defendant found the plaintiff lacking in a number of performance standards. The plaintiff therefore had to show that the employer's proffered reasons for taking the adverse actions were actually a pretext for prohibited retaliatory conduct. *See Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 507 n. 6 (11th Cir.2000), citing *Sullivan v. National Railroad Passenger Corp.,* 170 F.3d 1056, 1059 (11th Cir.1999) (quoting *Raney v. Vinson Guard Service,* 120 F.3d 1192, 1196 (11th Cir.1997). The plaintiff must do more than merely allege pretext to make out a triable issue of fact. *Earley v. Champion Intern. Corp.*, 907 F.2d 1077, 1084 n. 5 (11th Cir.1990). Instead, the plaintiff must point to "concrete evidence in the form of specific facts which show that the defendant's proffered reason is mere pretext. Mere conclusory allegations and assertions will not suffice." *Earley,* 907 F.2d at 1081. Simply questioning the wisdom or accuracy of the employer's conclusion that the plaintiff was an

27

unsatisfactory employee is insufficient to create a genuine issue of material fact.  *See e.g., Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir.2004).   Therefore, the court must grant summary judgment on plaintiff's claims of reprisal as well.

## CONCLUSION

Having considered the foregoing, and finding that the plaintiff has failed to establish any genuine issue of material fact sufficient to allow this case to proceed to trial, the court shall order that the defendant's motion for summary judgment on all counts of the plaintiff's complaint is due to be granted and the plaintiff's claims shall be dismissed with prejudice.

**DONE** and **ORDERED** this the 9th day of May, 2012.

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE